UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

**AARON GREENSPAN,**

    Plaintiff,

        v.

**RANDOM HOUSE, INC.; MEZCO, INC.;
BENJAMIN MEZRICH; COLUMBIA
PICTURES INDUSTRIES, INC. a/k/a SONY
PICTURES a/k/a COLUMBIA TRISTAR
MOTION PICTURE GROUP,**

    Defendants.

Case No.:

**COMPLAINT FOR
INJUNCTIVE RELIEF AND
JURY DEMAND**

---

Plaintiff Aaron Greenspan, by and for his complaint against Random House, Inc., Mezco,

Inc., Benjamin Mezrich and Columbia Pictures Industries, Inc. a/k/a Columbia TriStar Motion

Picture Group (collectively, "Defendants"), avers as follows:

### INTRODUCTION AND SUMMARY

1.  Plaintiff brings this action to enforce Plaintiff's exclusive copyright rights, and to

halt Defendants' unfair business practices, false advertising, libel, and slander. This case arises

out of four main actions on the part of Defendants.

2.  First, this case arises from Defendants' collective exploitation of Defendant

Benjamin Mezrich's fictitious literary work *The Accidental Billionaires: The Founding of*

*Facebook: A Tale of Sex, Money, Genius, and Betrayal* ("The Accidental Billionaires"), which is

an unauthorized derivative of Plaintiff's non-fiction book *Authoritas: One Student's Harvard*

*Admissions and the Founding of the Facebook Era* ("Authoritas"). Plaintiff is the sole author of

Authoritas and the sole owner of the copyrights therein.  To date, Authoritas is the only published first-hand account of events that took place at Harvard University in 2003 and 2004 that collectively inspired the founding of Facebook, Inc.  Aside from the plain facts, Authoritas also contains copyrighted expression that appears in The Accidental Billionaires.  Defendant Mezrich is the author of The Accidental Billionaires; Defendant Random House, Inc. ("Random House") is the publisher.

3.   Defendants Mezrich, Mezco, Inc. ("Mezco") and Random House sold derivative rights, including motion picture rights, in The Accidental Billionaires to Defendant Columbia Tristar Motion Picture Group ("Sony Pictures") before The Accidental Billionaires was even finished being written.  The sale of these rights ultimately resulting in the creation of a motion picture entitled *The Social Network* ("The Film"), released nationwide in movie theaters in October 2010, and subsequently in DVD, Blu-Ray and streaming video formats.  Due to its connection to The Accidental Billionaires, The Film also makes unauthorized use of copyrighted material contained in Authoritas.  Defendants did not at any point obtain the consent of Plaintiff to use material from Authoritas in The Film, nor did Defendants obtain derivative rights in Authoritas.

4.   Second, this case arises from the unfair business practices of Defendant Random House, whose Doubleday publishing imprint agreed to publish The Accidental Billionaires not long after refusing to publish Authoritas, and then used unfair business tactics to market The Accidental Billionaires in such a manner as to avoid paying Plaintiff for rights in Authoritas.

5.   Less than seven months after Defendant Random House rejected Plaintiff's manuscript, on May 22, 2008, *Gawker* reported that Defendant Mezrich had already "signed a million-dollar-plus book deal for his memoir about Mark Zuckerberg and the other Facebook founders."  Though this article's use of the word "memoir" implies that like Plaintiff, Defendant

Mezrich was present at Harvard University for the events described by his book proposal, in actuality he was not. It was later revealed that the book deal for The Accidental Billionaires was signed with the same Doubleday division of Defendant Random House, Inc.

6.   Approximately two months later, beginning July 30, 2008 as he was preparing to write The Accidental Billionaires, Defendant Mezrich sent a series of e-mails to Plaintiff requesting cooperation with "a thriller in the vein of my other books, with the origins of facebook at the center." Plaintiff declined to cooperate with Defendant Mezrich on what Plaintiff referred to as the "novel," but did refer him to the web site for Authoritas, plainly indicating a simple desire to be represented in the story fairly and accurately: not to be completely excluded, nor to be represented falsely. Defendant Mezrich signaled that he understood Plaintiff's desire for accurate representation when he replied, "Understood. Thanks for your time, I'll do my best to do the story justice and make it as entertaining as possible."

7.   Defendants Mezrich and Random House deliberately classified the book as non-fiction. In making this deliberately false designation, by failing to correct references to the book as Defendant Mezrich's "memoir," and by quietly attempting to secure Plaintiff's cooperation for Defendant Mezrich's project, Defendants attempted to avoid any need to license the necessary rights in Authoritas by creating the impression that Defendant Mezrich's work was original and based on a first-hand account.

8.   As a consequence of the success of The Accidental Billionaires and The Film, several million people have been exposed to the story line as told by Defendant Mezrich.

9.   Third, Defendants explicitly and implicitly defamed Plaintiff in The Accidental Billionaires and by omission, in The Social Network. However briefly, the Accidental Billionaires ridicules Plaintiff and insults Plaintiff's work; no references to Plaintiff in The

Accidental Billionaires are praiseworthy, and key references to Plaintiff that one would expect in an accurate re-telling of events are omitted.  The Film completely omits references to Plaintiff.

10.  Fourth, since publishing The Accidental Billionaires, Defendant Mezrich has granted several interviews, many of them on national television or radio programs, in which he has repeatedly made false claims, including claims that The Accidental Billionaires and The Film are "true," "accurate," and in the case of the book, "non-fiction."  In so doing, Defendant Mezrich has necessarily implied that any contrasting accounts of the same events, including Plaintiff's account, are untrue, inaccurate, and fiction.  Defendant Mezrich has further publicly attributed false motives to Plaintiff's critiques of his work, including but not limited to jealousy, misdirected anger, and desire to attract unwarranted media attention.

11.  Despite Defendant Mezrich's history of falsifying facts for his own personal financial gain, he has never been required to label his work as fiction.  His willing, almost eager desire to conflate the phrase "based on a true story," with the word "true" has caused substantial and irreparable harm to Plaintiff.

12.  To remedy these myriad violations of law and put an end to the ongoing harm caused by Defendants, Plaintiff Aaron Greenspan seeks injunctive relief restricting Defendants' ability to sell or refer to The Accidental Billionaires as "true," "accurate," "non-fiction," or any phrase with similar meaning.  Plaintiff further seeks monetary damages from Defendants for copyright and derivative works licensing revenues wrongly withheld, and for irreparable harm done to Plaintiff's reputation, career, and future earning potential.

## JURISDICTION

13.  The United States District Court for the District of Massachusetts has jurisdiction over this action pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1338, and has jurisdiction over

state law and common law claims pursuant to the doctrine of pendant jurisdiction. The amount in controversy exceeds seventy-five thousand dollars ($75,000), exclusive of interest and costs.

14. This Court has authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief under 28 U.S.C. 1343(3); the requested damages under 28 U.S.C. 1343(3); and attorney's fees under 42 U.S.C. § 1988.

## VENUE

15. Venue is proper under 28 U.S.C. § 1391 in the United States District Court for the District of Massachusetts because a substantial part of the actions or omissions giving rise to this case occurred within this District, and at least one Defendant resides within this District.

## THE PARTIES

### Plaintiff

16. Plaintiff Aaron Greenspan is the author of Authoritas, residing in Palo Alto, California. Plaintiff is a private citizen who does not hold public office and is not known to the vast majority of the general public.

### Defendants

17. Upon information and belief, Defendant Random House, Inc. is a corporation organized and existing under the laws of the State of New York whose products are sold worldwide, including in the Commonwealth of Massachusetts; Random House is a wholly owned subsidiary of Bertelsmann AG, a corporation with its primary place of business in Gütersloh, Germany, and operates, owns or controls other Random House entities in the United States, including Knopf Doubleday Publishing Group ("Doubleday"). Random House benefited from the infringing behavior of the other Defendants and has engaged in continuous and systematic false advertising of The Accidental Billionaires as well as unfair business practices.

5

18. Upon information and belief, Defendant Mezco, Inc. is a corporation organized and existing under the laws of the Commonwealth of Massachusetts. Mezco, Inc. benefited from the infringing behavior of the other Defendants and is listed as an owner of the copyrights in The Accidental Billionaires. By virtue of the fact that Defendant Mezrich is the President, Treasurer, Secretary and Director of Mezco, Inc., Mezco, Inc. conducts business in this District in the Commonwealth of Massachusetts inasmuch as Mr. Mezrich does. Mezco has an office in this District in the Commonwealth of Massachusetts located at 770 Boylston Street, Suite 26J, Boston, MA 02199.

19. Upon information and belief, Defendant Benjamin Mezrich is an individual whose primary place of residence is in the Commonwealth of Massachusetts, is a contractor or other agent of Random House, and is an owner and/or agent of Defendant Mezco, Inc. Defendant Mezrich originated the infringing behavior pertinent to this action, benefited from the infringing behavior of the other Defendants, and has engaged in continuous and systematic false advertising of The Accidental Billionaires and The Film. Defendant Mezrich at all times material hereto was conducting business in the Commonwealth of Massachusetts and this District and/or has transacted business within the Commonwealth of Massachusetts and/or contracted to supply goods or services in the Commonwealth of Massachusetts in connection with the matters giving rise to this suit. Defendant Mezrich has also committed infringing acts outside of the Commonwealth of Massachusetts causing injury to Plaintiff in the Commonwealth of Massachusetts, and Defendant Mezrich regularly does or solicits business in the Commonwealth of Massachusetts, and/or derives substantial revenue from goods used or services rendered in the Commonwealth of Massachusetts, and/or expects or reasonably should expect their infringing conduct to have consequences in the Commonwealth of Massachusetts and derive substantial revenue from interstate commerce.

20. Upon information and belief, Defendant Columbia Pictures Industries, Inc. is a corporation organized and existing under the laws of the State of Delaware and is registered to do business in the Commonwealth of Massachusetts as a foreign business corporation; Sony Pictures is a wholly owned subsidiary of Sony Corporation of America, a corporation with its primary place of business in New York City, New York, and operates owns or controls other Sony Pictures entities, including Columbia TriStar Motion Picture Group, Columbia Pictures and TriStar Pictures. Sony Pictures benefited from the infringing behavior of the other Defendants and is listed as an owner of the copyrights in The Accidental Billionaires and The Film.

21. Upon information and belief, Defendants Random House, Mezco, Mezrich, and Sony Pictures are, and at all times material hereto were, the alter-egos of each other and a unity of interest and ownership among such Defendants exists such that any separateness has ceased to exist; and these Defendants, and/or each of them, used assets of the other Defendants, and/or each of them, for its and/or their separate, individual purposes, and they transferred valuable assets, property rights and/or interests to each other without adequate consideration.

22. Upon information and belief, each and all of the Defendants jointly and severally participated in the infringing activity as set forth below and each Defendant was acting within the course and scope of employment, partnership and/or agency with the other, and each of the Defendants is jointly and severally liable for the injuries to Plaintiff.

**FACTUAL BACKGROUND**

**A. Plaintiff's Original Work: Authoritas**

23. As an undergraduate at Harvard University, Plaintiff developed a web site for students, faculty and alumni he called "The Facebook" as part of a larger, original web site he had created called houseSYSTEM. One of Mr. Greenspan's classmates, who was familiar with both houseSYSTEM and The Facebook, was an individual named Mark Zuckerberg, who, only

7

after extensive use of Plaintiff's work and after soliciting the assistance of Plaintiff in both

technical and business matters, incorporated many of Plaintiff's ideas into his own web site

which he labeled with the same name. Mr. Zuckerberg's web site, based in part on principals

and technologies developed by Plaintiff, formed the basis for the company that is now Facebook,

Inc. ("Facebook"), of which Mr. Zuckerberg is Chief Executive Officer.

24. After its launch, Mr. Zuckerberg's version of The Facebook became phenomenally

popular, and reportedly has hundreds of millions of users worldwide.

25. At least as early as 2005, Mr. Zuckerberg made repeated false claims in public

concerning the origins of his work, including statements that prior to his Facebook, no such web

site existed at Harvard University. Despite being in touch with Plaintiff throughout late 2005,

Mr. Zuckerberg systematically excluded Plaintiff from any recognition for contributions to his

success and from the company Plaintiff had indirectly helped create. Mr. Zuckerberg also

repeatedly ignored Plaintiff's growing concerns about glaring privacy and security problems

with Mr. Zuckerberg's site. Due to his public opposition to Mr. Zuckerberg's conduct, for a

period of years after graduating from college, Plaintiff was unable to raise venture capital

investment for his own company or find work in the software industry, which in turn meant that

he could not obtain health insurance, all despite having created products judged by others to have

practical use and value.

26. To correct Mr. Zuckerberg's false claims and settle the controversy surrounding the

origins of Facebook, Inc., Plaintiff wrote a memoir, backed by extensive written documentation,

entitled *Authoritas: One Student's Harvard Admissions and the Founding of the Facebook Era.*

27. After *The New York Times* published an article concerning Plaintiff on September 1,

2007 in which Mr. Zuckerberg did not deny any of Plaintiff's allegations and stated "through a

spokeswoman that he was not sure how to respond," Plaintiff entered into a written contract with

a respected literary agent, Mr. Jonathon Lazear, to sell the manuscript for Authoritas to a publisher.

28. Mr. Lazear submitted the manuscript for Authoritas to editors at a number of major publishing houses including Doubleday, an imprint of the Knopf Doubleday Publishing Group, which is a division of Defendant Random House. On October 30, 2007 at 2:30 P.M., Plaintiff and Mr. Lazear met with Mr. Charlie Conrad, an editor at Doubleday, concerning Authoritas. Mr. Conrad expressed concern that few readers would be interested in a personal story concerning Harvard University and the origins of the Facebook web site. Mr. Conrad later turned down the manuscript; a specific reason why was never conveyed to Mr. Greenspan.

29. On March 31, 2008, fearing that the public's interest in Facebook would eventually fade, and without declared interest from any major publishers, Plaintiff elected to publish his manuscript on his own through his company, Think Computer Corporation, under the "Think Press" imprint. Mr. Greenspan exercised his right to terminate his contract with his literary agent and Authoritas was published in hardcover form on June 1, 2008. The copyright was registered in Plaintiff's name with the United States Copyright Office on April 13, 2008.

30. When Google, Inc. refused to allow Plaintiff to advertise Authoritas through the Google AdWords service due to the use of the word "Facebook" in the subtitle, which Google considered a trademark, Plaintiff petitioned the United States Patent and Trademark Office Trademark Trial and Appeal Board to cancel one, and then two, of Facebook's registered trademarks for the term FACEBOOK.

31. Mr. Zuckerberg, Facebook, Plaintiff, and Plaintiff's company, Think Computer Corporation, reached a joint confidential settlement agreement in May, 2009.

9

### B. Defendants' First Infringing Work: The Accidental Billionaires

32. On July 30, 2008, Plaintiff received an unsolicited e-mail communication from Defendant Mezrich, who sought to meet with Plaintiff in order to obtain his assistance with an undefined project. After Plaintiff inquired as to Defendant Mezrich's basis for requesting a meeting, Mr. Mezrich stated that he was working on a new book about Facebook's origins, and that he considered Plaintiff to be "a very knowledgeable source."

33. In reply, Plaintiff explicitly declined to assist Defendant Mezrich with his "thriller" via e-mail, referring him instead to the web site for Authoritas. Plaintiff specifically referred to Defendant's project as a "novel," indicating that Plaintiff expected the work to be marketed as fiction. Plaintiff's communications did not construe or imply a waiver of any kind. Plaintiff did not directly hear from Defendant Mezrich again after this exchange.

34. Upon information and belief, on January 27, 2009, a Certificate of Registration (number V3575D081) was issued for a "recorded document" entitled "The accidental billionaires : f.k.a. Facebook project," with the copyright claimants listed as "Mezco, Inc." and "Columbia Pictures Industries, Inc."

35. On June 24, 2009, in an article about The Accidental Billionaires, *The New York Times* wrote, "Doubleday has classified the book as nonfiction." The same article went on to point out that Defendant Mezrich had "fabricated characters and situations" in his previous "nonfiction" works, casting doubt on the accuracy of Doubleday's latest classification.

36. On July 14, 2009, Defendant Random House published The Accidental Billionaires.

37. Defendant Mezrich's book The Accidental Billionaires was widely disseminated throughout the United States via distribution to retail bookstores and electronic book web sites on the internet. By virtue of association with a major publishing company, and due to Defendant Mezrich's financial success with his previous works, The Accidental Billionaires was reviewed

in major national newspapers, magazines, and radio programs. The Accidental Billionaires was also released internationally.

38. Authoritas is listed as a secondary source in The Accidental Billionaires. The subtitle, "One Student's Harvard Admissions and the Founding of the Facebook Era" is missing from the listing.

39. The Accidental Billionaires describes a meeting between Lawrence Summers, former president of Harvard University, and two individuals other than Plaintiff involved in a separate dispute over Facebook's origins ("the Infringing Account"). The Infringing Account repeatedly makes use of copyrighted expression found in a similar chapter describing a meeting between Plaintiff and Lawrence Summers in Authoritas ("the Original Account"). Defendants' additions, alterations, and editing choices provide evidence of copying rather than independent creation.

40. Upon information and belief, all Defendants with knowledge and intent, financed, developed, produced, manufactured, distributed, and exploited The Accidental Billionaires which made use of copyrighted material from Authoritas without properly securing consent, approval of, a grant, or license from the Plaintiff.

41. Plaintiff sent Defendants Random House and Mezrich two letters of complaint on August 5, 2009 and August 10, 2009. General Counsel for Defendant Random House denied any similarities between the works.

42. Defendant Random House provided The Boston Herald and The Boston Globe a terse statement generally denying any wrongdoing after those newspapers reported Plaintiff's allegations. This statement cast aspersions on Plaintiff, falsely accusing Plaintiff of seeking publicity for his own book, adding insult to injury.

43. An analysis of The Accidental Billionaires reveals expressions of ideas, the compilation of ideas, a concrete pattern or sequence of events, and scenes that are substantially

similar to those contained in Authoritas. While parallels between two meetings months apart

with the same individual concerning similar subject matter might not be surprising to most, the

fact that only Plaintiff actually recorded and published, in Authoritas, a written account of one of

these meetings calls into the question the source of Defendant Mezrich's surprisingly accurate

detail—one of the only portions of The Accidental Billionaires not rife with errors. Similarities

between the two works include:

| <u>Authoritas</u> | <u>The Accidental Billionaires</u> |
|---|---|
| *Identical Expression* | |
| 1. <u>Subtitle</u><br>One Student's Harvard Admissions and the **Founding of the Facebook** Era | <u>Subtitle</u><br>The **Founding of Facebook**, A Tale of Sex, Money, Genius and Betrayal |
| *Identical Expression* | |
| 2. <u>Chapter 11 Heading (Page 123)</u><br>The Cars of **Harvard Yard** | <u>Chapter 2 Heading (Page 11)</u><br>**Harvard Yard** |
| *Identical Expression* | |
| 3. <u>Chapter 24 Heading (Page 270)</u><br>**Veritas** | <u>Chapter 16 Heading (Page 122)</u><br>**Veritas** |

*Identical Inclusion of Detail, Modified Expression: A student waits on a sofa outside of the University President's office, which is specifically described in relation to the rest of Harvard Yard.*

| | |
|---|---|
| 4. <u>Page 1</u><br>"I was sitting on a plush beige sofa in an office in Massachusetts Hall, a small rectangular building lodged snugly next to Harvard Yard's Johnston Gate." | <u>Page 123</u><br>"So here they were, sitting next to each other on a couch that felt as old as Massachusetts Hall itself, being gawked at by a receptionist."<br><u>Page 124</u><br>"The entrance to the building was perpendicular to University Hall, where the legendary statue of John Harvard stood...'" |

*Identical Expression: The University President's anonymous female receptionist announces that the President is ready for the meeting.*

5. Page 285
"'**The President will see you** in a moment,' **the woman** smiled."

Page 124
**The woman** grabbed the receiver, nodded, and then glanced in their direction. "**The president will see you now**."

*Identical Inclusion of Detail, Modified Expression: The narrator describes the inside of the President's office in unnerving terms reflecting its core importance.*

6. Page 1
"The walls were painted a deep shade of red, which by virtue of their location in Harvard's inner sanctum defined the word crimson."

Page 124
"And now that they were sitting there, in the waiting room of the ultimate power on campus—it was hard to fight off a looming sense of dread."

*Identical Inclusion of Detail, Modified Expression: The anonymous female receptionist motions toward the furniture in the office.*

7. Page 285
"She motioned to a small sofa that was positioned across from a giant armchair."

Page 125
"She waved them both in, pointing to the chairs in front of the desk."

*Identical Inclusion of Detail, Modified Expression: The narrator describes the office in additional detail, with attention focused on furniture.*

8. Page 1
"There was a **computer** with a sleek flat screen on a **desk** on the other side of the room, and the dark African masks resting on the **shelves** to my left were silently watching me think."

Page 125
"There were book**shelves** lining one wall, a huge wooden **desk**, a bunch of antique-looking side tables, and a small sitting area atop an Oriental carpet. On the desk, Tyler noticed a Dell desktop **computer**."

*Identical Expression: The narrator describes the personality of Harvard University then-President Lawrence Summers.*

9. Page 5
"The President paused to think, tapping his foot under the table. I had never observed such **palpable** impatience before."
"My tone of voice carried a mixture of **dis**gust and **dis**belief..."

Page 126
"The **dis**dain in Summers's voice was **palpable**."

*Identical Inclusion of Detail, Modified Expression: The President is introduced simultaneous with his assistant.*

10. Page 3

Page 126

"A minute or two later, **the President** himself walked into the room, followed by an **African-American woman**."
Page 6
"'Nope, other door," the **assistant** motioned..."

"As they entered the office, **Summers** was sitting in a leather chair behind his desk, a phone pressed against his ear. A few feet away sat his executive **assistant**—a pleasant-looking **African American woman**."

*Identical Expression: The President is referred to as "chubby" and rhetorical styles match.*

11. Page 6
"I felt positively sickened. **The President** believed The Harvard Crimson—the same newspaper that had insinuated that he was fat, **chubby**, and slow—more than he believed an undergraduate who had taken the time to share a real concern at his office hours."

Page 130
"It was truly depressing. **The President** of the university was telling them that they were on their own. The administration was washing its hands of the whole thing."
Page 126
"Slowly, Summers leaned forward, and his **chubby** hand..."

*Identical Inclusion of Detail, Modified Expression: The President opens the meeting with a hostile question.*

12. Page 1
"'What can I do for you?' he said. From the moment the sound of the first word left his mouth and entered my ear, I knew that our meeting would be nothing less than a verbal train wreck. His tone indicated that I was already being ridiculed."

Page 126
"He leaned back in his chair—put his feet up on his desk, and stared at the brothers with pure distaste in his eyes. 'Why are you here?'"

*Identical Inclusion of Detail, Modified Expression: The assistant takes notes.*

13. Page 1
"There was a woman sitting across from me, notebook in hand, ready to record my thoughts and emotional state so that in ten or twenty or a hundred years, someone might dig them out of a dusty filing cabinet."

Page 126
"He glanced at the African American woman, who was dutifully taking notes; she'd already written Summers's question down across the top of a blank sheet of lined notebook paper."

*Identical Inclusion of Detail, Modified Expression: The student's frustration is manifested by flush cheeks.*

14. Page 6
"'Nope, other door,' the assistant motioned, pointing behind me, and setting

Page 126
"Tyler coughed, his face turning red."

my cheeks on fire."

*Identical Expression: The student's frustration is manifested by a pause in the conversation, followed by a reference to the student's throat.*

15. <u>Page 4</u>
"I sat, dumbfounded. After five very long seconds, sitting like a pigeon on his couch, I regained my composure."
"'I know what **the man** said,' I snapped in my mind. Outwardly, **I swallowed**."

<u>Page 128</u>
"After he let a few seconds pass, so **the man** could at least pretend to reread their letter, **Tyler cleared his throat**."

*Identical Expression: The President counters the student's allegations with a question.*

16. <u>Page 4</u>
"The President's mouth twisted into a smile. 'Well, Aaron, **what do you want me to do?**'"

<u>Page 128</u>
"'So **what do you want me to do** about it?'"

*Identical Expression: The rhetorical device of repetition is used to express dissatisfaction with the educational system, referred to as "the system."*

17. <u>Page 89</u>
"My hatred for **the system**—my teachers, my classes, my so-called friends, my activities—had reached new levels."

<u>Page 130</u>
"He felt... betrayed. By this man, by **the system**, by the university itself."

*Identical Expression: The student posits the possibility that the situation is unprecedented.*

18. <u>Page 5</u>
"'There are no real channels to go through at Harvard to make a site **like this**.'"

<u>Page 130</u>
"'The university isn't equipped to handle a situation **like this**.'"

*Identical Expression: The President's inability to see the student's point of view is shocking.*

19. <u>Page 2</u>
"'**I do not see** the instance of disrespect here,' the President said flatly. I was **shocked**."

<u>Page 129</u>
"'I've read your complaint. And I've read Mark's response. **I don't see** this as a university issue.'"
<u>Page 128</u>
"Tyler stared at the man in **shock**."

*Identical Inclusion of Detail, Modified Expression: Silence makes the conversation especially awkward.*

20. <u>Page 4</u>

<u>Page 130</u>

"What President Summers means is not that you are 'enjoying' the fight," his assistant said looking at President Summers, and then at me. There was an awkward silence."

"It was obvious from his silence that he really didn't care what Tyler and Cameron did about the situation."

*Identical Expression: At the end of a conversation, each student reaches the conclusion that there is only one thing to do.*

21.  Page 6
"There was **only one thing** to do."
'**I have got to get out of here**.'"

Page 131
"The **only thing** left, Tyler realized, was to go after Mark themselves."
Page 230
"Eduardo felt the walls closing in around him. **He had to get out of there**."

44.  In addition to similarities with Authoritas, The Accidental Billionaires contains an extremely high number of errors, enumerated in the attached Schedule B.

45.  Upon information and belief, Defendant Random House's gross revenue for The Accidental Billionaires exceeds $1,000,000.00.

46.  Upon information and belief, Defendants' combined gross revenue for The Accidental Billionaires exceeds $10,000,000.00.

### C. Defamatory Material Concerning Plaintiff in The Accidental Billionaires

47.  Plaintiff is referred to directly in The Accidental Billionaires as "Aaron Greenspan" and erroneously as just "Grossman" (more than once) on pages 80, 84, 96 and 115. Plaintiff is further referred to as in several instances as "some kid," and "kid."

48.  Defendant Mezrich writes, "Grossman had even added a Universal House Facebook into his site, which Mark had checked out; hardly anyone had paid any attention to it...And Grossman's site wasn't particularly slick." These statements contain several errors, cast aspersions on Plaintiff's work and character, are intended to inflict harm, and are demonstrably false.

16

49. Defendant Mezrich was not aware of Plaintiff's work in 2003 or 2004, and consequently never had the opportunity to see or use the web site described. Therefore, Defendant Mezrich had no substantive basis for referring to Plaintiff's work in a derogatory manner.

50. Despite citing Authoritas as a source in his bibliography, and despite lifting aspects of Plaintiff's expression from Authoritas, Defendant Mezrich omitted key aspects of Plaintiff's work on The Facebook (as part of houseSYSTEM) from The Accidental Billionaires. This decision on Defendant Mezrich's part had two serious consequences: first, the omissions changed the narrative arc of the story in a manner such that other characters appeared in a far more positive light than deserved; and second, the omissions harmed Plaintiff by completely withholding proper recognition that was instead attributed to other characters, and in particular, Mr. Zuckerberg.

51. The wide distribution granted to Defendant Mezrich's story and subsequent remarks, not just in movie theaters, but on channels with nationwide distribution such as C-SPAN known for their unedited, factual material, has given him a de facto air of legitimacy.

52. Since the publishing of The Accidental Billionaires, Defendant Mezrich has repeatedly defended his work in highly publicized forums as "true," despite the long list of errors and omissions detailed by Plaintiff and others. Each time that Defendant Mezrich has insisted on the veracity of his work, he has magnified the harm of the initial defamation, both explicit and implicit by omission. At times he has magnified and then compounded the harm by making slanderous accusations regarding his critics and their motives.

53. Consequently, each effort by Plaintiff to reasonably counter Defendants' false claims has caused more and more harm to Plaintiff's reputation, instead of causing Defendant to cease and desist.

17

### D. Defendants' Second Infringing Work: The Social Network

54. Upon information and belief, it was Defendants' collective intent to create a motion picture version of The Accidental Billionaires at least as early as July, 2008, before the book was even written.

55. In his July, 2008 e-mail communications Defendant Mezrich deliberately failed to inform Plaintiff of his intent to specifically license The Accidental Billionaires to a motion picture studio (eventually, Defendant Sony Pictures).

56. Upon information and belief, at some point in, around or prior to August, 2008, Defendants entered into an agreement to create a screenplay based on The Accidental Billionaires ("The Screenplay").

57. Mr. Aaron Sorkin was hired to write The Screenplay for The Film, eventually entitled "The Social Network," the first draft of which was completed by July, 2009. In writing The Screenplay, Mr. Sorkin collaborated closely with Defendant Mezrich. The Screenplay is a derivative work of the account found in The Accidental Billionaires.

58. All Defendants with knowledge and intent, financed, developed, produced, manufactured, distributed, and exploited The Film without properly securing consent, approval of, a grant, or license from the Plaintiff.

59. None of the named Defendants made any effort to remove from The Screenplay or The Film copyrighted elements and material embodied in Authoritas, and the acts, failures, and omissions constitute a reckless disregard of Plaintiff's rights and interests.

60. At the time, Plaintiff was not even aware of whether or not Plaintiff would be mentioned in The Screenplay. To find out, Plaintiff sent Mr. Sorkin inquiries via e-mail, via postal mail, and even via the particular Facebook web page specifically dedicated to The Film, which was frequented by Mr. Sorkin. All of these communications went unanswered.

61. The Film was released October 1, 2010.

62. The Film contains a scene involving a meeting between former President of Harvard University Lawrence Summers and Tyler and Cameron Winklevoss. Though this scene represents a different meeting with Dr. Summers than Plaintiff's meeting, The Film's representation is based upon Defendant Mezrich's account, in which many aspects of descriptive detail are expressed in the same or similar fashion as Authoritas.

63. Based in part on Authoritas, The Film and some of the trailer films used for its promotion also contain a scene involving Mr. Zuckerberg's Administrative Board hearing at Harvard University, in which Mr. Zuckerberg's character states, "As for any charges stemming from the breach of security, I believe I deserve some recognition from this Board." This unusual and confusing outburst in the context of a disciplinary hearing, about which no public records are available from the actual event, makes little sense given what the viewer knows about Mark Zuckerberg's character in The Film. It has been widely reported that the Film's writers did not at any point have Mr. Zuckerberg's cooperation, and it is also known that Administrative Board hearings are not open to uninvolved parties. Without any context, the idea that Mr. Zuckerberg would expect credit from the university administration for uncovering security flaws can simply be attributed to his supposed arrogance or "genius," but with context from page 270 of Authoritas, an important and identical plot element fills the gap. On that page, Plaintiff expresses frustration about Harvard University's unacknowledged "proof that I had voluntarily informed the Admissions Office of multiple vulnerabilities in their systems," which was significant because the same administration had then grown concerned about and unjustifiably critical of the security of Plaintiff's work.

64. Mr. Sorkin, unlike Defendant Mezrich, at least made it clear that The Film was not intended to be true. In an article published in New York Magazine on September 17, 2010, Mr.

Sorkin stated, "I don't want my fidelity to be to the truth; I want it to be to storytelling." Nonetheless, Defendant Mezrich has repeatedly insisted that both The Accidental Billionaires and The Film are "true."

65. The Accidental Billionaires and The Film have both been extremely successful business ventures for Defendants, yielding hundreds of millions of dollars in combined revenue. According to the Wikipedia entry for The Social Network, "during its opening weekend in the United States, the film debuted at #1, grossing $22.4 million in 2,771 theaters... As of August 19, 2011, the film has grossed $96,962,694 in the United States and $127,957,621 elsewhere, for a worldwide total of $224,920,315."

### E. Defamation by Omission of Plaintiff in The Social Network

66. Plaintiff does not appear explicitly by name in The Film, nor is any character intended to represent Plaintiff.

67. While Plaintiff did decline the opportunity to assist Defendant Mezrich with a fictional literary work, such declination was made with the understanding that the literary work would actually be marketed as fiction, and that there would be no derivative licensing of such a work.

68. Plentiful evidence to the contrary aside, Defendant Mezrich is absolutely insistent on both The Accidental Billionaires and The Film being "true."

69. Defendant Mezrich has consequently caused significant harm to Plaintiff through the implication, understood by millions of viewers of The Film, that Plaintiff had no role in the creation of Facebook. This implication has been conveyed to the public repeatedly, each time magnifying the harm of the initial act.

70. Defamation by omission is in some ways more damaging than the simple conveyance of falsehoods. Even a sympathetic viewer of The Film inclined to disbelieve its

accuracy would still come away from it lacking any frame of reference needed to discover the facts involving Plaintiff's involvement. It is impossible to know how many opportunities were lost to Plaintiff due to this prominent information gap.

### F. Defamation of Plaintiff by Defendant Mezrich After The Social Network

71. On November 6, 2011, C-SPAN aired a three-hour-long interview with Defendant Mezrich concerning The Accidental Billionaires and The Film, among other topics. The interview format allowed callers to directly ask questions of Defendant Mezrich, with the help of a host who facilitated the calls.

72. Approximately three-quarters through the length of the interview, Plaintiff's father, Dr. Neil Greenspan, called C-SPAN of his own volition and was permitted to ask a question to Defendant Mezrich. Dr. Greenspan then asked Defendant Mezrich why he did not simply refer to his books as fiction.

73. At the program host's request for additional detail, Dr. Greenspan identified himself as the father of Plaintiff, who was referred to by name, and provided brief background information.

74. Defendant Mezrich's response was lengthy, defensive, rambling, erroneous, and cast unfounded aspersions on both Plaintiff and Dr. Greenspan that were defamatory in nature. In his multi-part response, Defendant Mezrich reiterated that The Accidental Billionaires was "true," "accurate," and "non-fiction," and that he "stands by" both The Accidental Billionaires and The Film. These repeated false statements further defamed Plaintiff and Plaintiff's father by implication.

75. On the evening of November 6, 2011, Plaintiff sent Defendant Mezrich and C-SPAN an e-mail regarding the interview, published on Plaintiff's personal web site immediately

21

thereafter, decrying the false statements, and Defendant's false statements about making false statements. Defendant Mezrich did not respond.

### G. Effects of Defendants' Explicit and Implicit Defamation on Plaintiff

76. Prior to the existence of The Accidental Billionaires or The Film, the typical difficulties inherent in starting any recent college graduate's career were significantly magnified by Plaintiff's unintended and unwanted involvement in controversy surrounding Facebook's origins. For many years, through the crafting of Authoritas and by other means, Plaintiff attempted to correct the wrongs that had led to his reputation being tarnished, without allowing those wrongs to remain his exclusive focus. Plaintiff was partially successful, as evidenced by the *New York Times* article published on September 1, 2007, which highlighted the fact that Plaintiff remained a creative and motivated individual despite the many significant challenges.

77. The Accidental Billionaires and The Film immediately reversed the vast majority of the progress Plaintiff had made toward setting the record straight. Whether intentional or not, news about the book proposal, the likelihood of the book becoming a movie, the book itself, and then the movie itself, all of which contained Defendant Mezrich's flawed story line, comprised a massive misinformation campaign. Even the effects of the most resourceful and active proponent of Plaintiff imaginable would have been dwarfed by the extent and volume of information distributed by and concerning Defendants' works. At one point leading up to the release of The Film, a banner advertisement for The Film covered the entire home page of the web site of *The New York Times*, not to mention other advertisements on busses, in newspapers, on the radio, on television, and in stores.

78. In interactions with influential figures in the software and financial industries in which Plaintiff still works, Plaintiff has more than once been lectured by individuals unaware of his involvement about the events that took place at Harvard University in The Film. Attempts to

politely correct these misapprehensions have been routinely met with suspicion or enormous scorn. These interactions, through no fault of Plaintiff, have damaged Plaintiff's reputation and career prospects.

79. Many individuals have encouraged Plaintiff to "move on" in life, but practically speaking, the magnitude of funding and media interest associated with Facebook now and for the foreseeable future, combined with the aforementioned prevalence of deeply flawed misinformation distributed broadly by Defendants that has tarnished Plaintiff, makes this impossible from a practical standpoint.

## CLAIMS FOR RELIEF

## FIRST CLAIM

### Copyright Infringement Against All Defendants (17 U.S.C. §§ 101 et seq.)

80. Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

81. Plaintiff owns copyright interests in Authoritas, which is an original copyrighted work under the laws of the United States.

82. Plaintiff has the exclusive right to prepare derivative works based upon the copyrighted work Authoritas pursuant to 17 U.S.C. § 106(2).

83. The Defendants' copying, use, modification, reproduction, display and distribution of elements of Authoritas, including without limitation, the ideas, expression of concepts, theme, text and plot contained therein and all derivatives thereof, constitutes a violation of the United States Copyright Act, Title 17 U.S.C. §§ 501(a), 106(1), 106(2) and 106(3), and all Defendants were acting as infringers within the meaning of 17 U.S.C. § 105(a).

84. The following United States Copyright Office Registrations are wrongful and illegal as they violate and infringe upon the rights and interests of the Plaintiff in connection with Authoritas:

a) Registration No. V3575D081 for a "recorded document" entitled "The accidental billionaires : f.k.a. Facebook project" with copyright claimants Mezco, Inc. and Columbia Pictures Industries, Inc.;

b) Registration No. TX0006990841 for "THE ACCIDENTAL BILLIONAIRES: The Founding of Facebook, A Tale of Sex, Money, Genius and Betrayal" with copyright claimant Mezco, Inc.;

c) Registration No. PA0001698016 for "THE SOCIAL NETWORK" with copyright claimants Columbia Pictures Industries, Inc. and Beverly Blvd LLC;

d) Registration No. PAu003479987 for "THE SOCIAL NETWORK" with copyright claimant Columbia Pictures Industries, Inc.;

e) Registration No. PA0001701493 for "THE SOCIAL NETWORK: Domestic Trailer #1" with copyright claimant Columbia Pictures Industries, Inc.;

f) Registration No. PA0001704490 for "THE SOCIAL NETWORK: Domestic Trailer #3" with copyright claimant Columbia Pictures Industries, Inc.;

g) Registration No. PA0001704489 for "THE SOCIAL NETWORK: Domestic Trailer #4" with copyright claimant Columbia Pictures Industries, Inc.

85. By all the Defendants' participation in the production, distribution, use, and exploitation of the Film, Defendants knowingly and willfully infringed, authorized others to infringe, and will continue to infringe Plaintiff's copyright in Authoritas.

86. As a proximate result of Defendants' copyright infringement, Plaintiff has suffered and will continue to suffer irreparable injury, some of which cannot be compensated in money damages if such wrongful conduct continues.

24

## SECOND CLAIM

**Contributory Infringement Against Defendants Random House, Sony Pictures and Mezco**

87. Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

88. Upon information and belief, Defendants Random House, Sony Pictures and Mezco, individually and in concert with the other named Defendants, encouraged, induced, or materially contributed to, the infringement of Plaintiff's copyrightable work, in that:

    a) Random House used, distributed, and/or exploited The Accidental Billionaires;

    b) Sony Pictures and its wholly owned subsidiaries produced, filmed, distributed, and edited The Film; and

    c) Sony Pictures distributed, promoted, and advertised the Film and provided financing for The Film.

89. Upon information and belief, Sony Pictures's actions were performed and are being performed with actual and constructive knowledge of Plaintiff's rights and interests.

90. Random House and Sony Pictures are jointly and severally liable for contributory copyright infringement.

## THIRD CLAIM

**Vicarious Copyright Infringement Against Defendants Random House, Sony Pictures and Mezco**

91. Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

92. Defendants Random House, Sony Pictures and Mezco had the right, authority, and the ability to control or supervise Defendants' actions, failures, and omissions which violated Plaintiff's copyright in Authoritas.

93. Defendants Random House, Sony Pictures and Mezco had knowledge of Plaintiff's rights and interests in Authoritas during the development, production, distribution, and exploitation of the Film.

94. Defendants Random House, Sony Pictures and Mezco obtained a direct financial interest, financial advantage, and/or economic consideration from the infringement.

## FOURTH CLAIM

### Federal Unfair Competition and False Advertising Against All Defendants

95. Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

96. Defendants' actions described above in commerce to advertise, market, and sell The Accidental Billionaires throughout the United States, including within the Commonwealth of Massachusetts; their use of misleading statements; their misrepresentations concerning the veracity of the narrative comprising The Accidental Billionaires, specifically including the designation of the book as "non-fiction" or "biography"; their misrepresentations concerning Defendant Mezrich's sources; their use of paid employees to misrepresent public opinion regarding the book through planted positive reviews; and Defendants' knowledge, participation, and inducement thereof, constitute unfair competition and false advertising in violation of 15 U.S.C. § 1125(b).

97. Consumers are likely to be misled and deceived, and have been misled and deceived, by Defendants' representations regarding The Accidental Billionaires.

98. Consumers are likely to be misled and deceived, and have been misled and deceived, by Defendants' representations of Plaintiff, and/or the lack thereof, contained within The Accidental Billionaires.

99. Consumers are likely to be misled and deceived by paid "five- star" reviews of The Accidental Billionaires that were written only because Defendants were compensating the reviewers.

100.Consumers are likely to be misled and deceived by bulk purchases of The Accidental Billionaires by Defendants that were designed to propel the book to the top of best-seller lists even though such purchases did not represent actual consumer interest.

101.Defendants knew or should have known that their statements and actions were false or likely to mislead.

102.Defendant's many deceptive statements intended to sell additional copies of The Accidental Billionaires and The Film violate Section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a), which prohibits Defendants from using false, misleading, or disparaging representations of fact that misrepresent the nature, characteristics, or qualities of its products.

103.As an actual and proximate result of Defendants' willful and intentional actions, Plaintiff has suffered damages in an amount to be determined at trial, and unless Defendants are enjoined, Plaintiff will continue to suffer irreparable harm and damage to its business, reputation, and goodwill.

104.Pursuant to 15 U.S.C. § 1117, Plaintiff is entitled to damages for Defendants' Lanham Act violations, an accounting for profits made by Defendants on sales of The Accidental Billionaires, as well as recovery of the costs of this action. Furthermore, Plaintiff is informed and believes, and on that basis alleges, that Defendants' conduct was undertaken willfully and with the intention of causing confusion, mistake or deception, making this an exceptional case entitling Plaintiff to recover additional damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

105.Plaintiff has no adequate remedy at law.

## FIFTH CLAIM

### Defamation of Aaron Greenspan by Benjamin Mezrich

106.Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

107.Defendant Benjamin Mezrich's written and frequently erroneous statements that Aaron Greenspan's work was irrelevant and of poor quality are false and untrue, and have defamed Aaron Greenspan.

108.Defendant Benjamin Mezrich's use of pejorative terms and incorrect names to describe Aaron Greenspan, in conjunction with his other writing have defamed Aaron Greenspan.

109.Defendant Benjamin Mezrich's selective omission of Aaron Greenspan's role in his written and verbal narrative concerning Facebook's origins has both directly and by implication defamed Aaron Greenspan.

110.Defendant Benjamin Mezrich's continuous insistence that his work is true, accurate, non-fiction and trustworthy has by implication defamed Aaron Greenspan.

111.Defendant Benjamin Mezrich's attribution of false motives to critics of his work, including false motives explicitly attributed to Aaron Greenspan and Aaron Greenspan's father, Dr. Neil Greenspan, have defamed Aaron Greenspan and his family.

112.By making or omitting such statements as necessary in print in a best-selling book published by a major publisher, in the context of a blockbuster movie seen by millions, and repeatedly on national television, Defendants published defamatory statements to a wide range of persons in the public.

113.Defendants negligently published the false and defamatory statements about Aaron Greenspan and his family, causing him to suffer damages, including numerous lost business opportunities, and injury to his reputation.

114. Defendants published the false and defamatory statements with the knowledge that the statements were false, or with reckless disregard as to the falsity of the statements, as evidenced by Defendant Mezrich's November 6, 2011 verbal statement on C-SPAN, that, "This is how I write...don't read it if you don't like it! You know? You know what you're getting into."

115. Defendants published the false and defamatory statements hoping to exploit them for financial gain, as evidenced by Defendant Mezirch's November 6, 2011 verbal statements on C-SPAN, that, "The controversy is good. It's good for me."

116. Defendants' defamatory statements injured the reputation of Aaron Greenspan.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests the following relief:

A. A permanent injunction, pursuant to 17 U.S.C. § 502, enjoining all Defendants, their officers, agents, employees, licensees, assigns, distributors, sub-distributors, and all persons acting in concert with them, from engaging in such further violations of the Copyright Act;

B. A permanent injunction enjoining all Defendants, their officers, agents, employees, licensees and assigns, distributors, sub-distributors, and all persons acting in concert with them, from engaging in or authorizing the production, copying, distribution and/or further exploitation of The Accidental Billionaires and The Film;

C. Recovery from all Defendants of the damages, including pre-judgment interest it sustained and will sustain, and any income, gains, profits, and advantages obtained by Defendants as a result of their wrongful acts alleged hereinabove pursuant to 17 U.S.C. § 504(b), in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial;

D. The maximum statutory damages in the amount of $30,000.00 per infringement, and/or $150,000.00 per willful infringement pursuant to 17 U.S.C. § 504(c), or for such other

amount as may be proper under 17 U.S.C. § 504(c). Plaintiff is further entitled to their attorney's fees and full costs pursuant to 17 U.S.C. § 505; and

E. For such other and further relief and remedies available under the Copyright Act, 17 U.S.C. §§ 101 et seq., and/or for which the Court may deem just and proper, including punitive damages.

F. Preliminarily and permanently enjoin Defendants from publishing further defamatory statements about Aaron Greenspan and/or his supporters, whether explicit or by implication;

G. Enter judgment against Defendants on all counts of the Complaint;

H. Award Plaintiff damages in an amount to be determined at trial;

I. Plaintiff's reasonable costs and expenses of this action, including attorneys' fees, in accordance with 42 U.S.C. § 1988 and other applicable law;

J. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury in this action of all issues so triable.

Respectfully submitted this 15th day of November, 2011.

Aaron Greenspan
884 College Avenue
Palo Alto, CA  94303-1303
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: greenspan@post.harvard.edu

30

## SCHEDULE A
### November 6, 2011 C-SPAN Interview Excerpt Transcript
### "In Depth with Ben Mezrich"

[Video available at http://www.c-spanvideo.org/program/BenMe/start/9104/stop/10800]

02:31:47

**Neil Greenspan:** I just wanted to say that I don't really think you should be using the word "non-fiction" for his books. I think they're non-"non-fiction."

**Host:** What does that mean, Neil?

**Neil Greenspan:** It means that the research isn't very careful, and there's lots of mistakes--and why doesn't he just call them fiction? I mean, you know, he can write thrillers and not make a claim that he can't really substantiate.

**Host:** Could you give an example of what you think is, is uh, not accurate?

**Neil Greenspan:** You say that when Zuckerberg started Facemash he, um, crashed all the computers at Harvard. It's just not true.

**Host:** Well--

**Neil Greenspan:** He crashed his own computer.

**Ben Mezrich:** No... Well, okay, go ahead.

**Host:** Now, I mean, Neil, where do you get your research?

**Neil Greenspan:** My son was at Harvard at the time. He started a web site that Zuckerberg was aware of...

**Host:** Your son did?

**Neil Greenspan:** Yes, that had numerous features of use to Harvard undergraduates and graduate students. It was started in August of 2003, months before Facemash or Facebook. He met with Zuckerberg before Facebook went live, and Zuckerberg visited his site which had a component--just one component of his site--which was called "The Facebook." This is all documented in my son's book, called "Authoritas."

**Host:** Authoritas.

**Neil Greenspan:** Yes. And all the documentation is available on-line. E-mails, server logs, documents, etc.

**Host:** Okay. What's your son's name, Neil, if people want to research this?

31

**Neil Greenspan:** Aaron Greenspan.

**Host:** Aaron Greenspan. Thank you, sir.

**Ben Mezrich:** Yeah, his son is mentioned in the book, actually, in my book. Um, uh, first off, it's a crazy discussion, but, yes, the way it is in the book is correct. My books are nonfiction, and I am very accurate about what happened in the Facemash incident. The computer servers were stopped, were crashed, I use the word "crashed." Mark's computer froze. I think we all know what it means when we say a computer "crashed." And as it is in the book and the movie, that's exactly how it happened. Um, the discussion about his son--ended up suing Facebook, I believe. I think there's some litigation going on. I don't know the details of it.

**Host:** People really care.

**Ben Mezrich:** Yeah. I mean, well, you know, this happened at college recently. It wasn't that long ago, so there were kids who were there. There's been a lot of lawsuits, not just Eduardo and the Winklevosses, There's that other big one, there's his kid, who was involved in some sort of lawsuit, about the name "face book." I don't remember how that worked out. I stand by the books.

And, you know, the things that people point out, like, this is a perfect example of it. It's a person who has a personal beef--with Zuckerberg or with Facebook, and they're bringing it out in the way they can in this conversation. It really has very little to do with my book.

The fact that I say the computers crashed, because his computer froze, and the network slow today the point where--slowed to the point where the person who ran the network had to come in--just like it is in the movie--Mark had to go in front of the Ad Board. How are you not saying that the computers crashed? I don't get where that is inaccurate.

How, I mean, this is what always boggles my mind about the attack on my book. There's nothing inaccurate about that. And yet someone will say, well, the computers didn't crash. But the computers crashed. We know it crashed. He was called in front of the Ad Board. He had-- he almost got kicked out of school. That's how the Winklevosses saw him, they saw him in the newspaper. So what are you arguing with? I don't get it. Maybe you have a definition of what a computer crashing than I do. Um, but, it goes on and on like this. My books will get attacked, people say, "it's not true, it's not true, it's not true," and you'll say, well, what's not true? And they'll point to some tiny thing on page 273 where something was blue instead of it was red.

You can pick up any book in the world and turn to page 273, and find something that was blue that was actually red. That's not what we mean when we say "non-fiction" and "fiction." What we mean when we say "non-fiction" and "fiction" are the facts of story correct or not. It's non- fiction if the story is true. These are true stories. It would be inaccurate to call them fiction. If I published these as fictional thrillers, the audience would be losing something because they wouldn't realize that these are true stories.

32

The only people who would benefit are the characters in the stories who don't want them told. Right? The character who doesn't want this story told would benefit by it being called fiction. The character who does want it told is benefited by its being called non-fiction.

I as a writer have to write the, a book as truthfully as I can, and the publisher has to decide whether they want to call it fiction or nonfiction. And that's really it. And me and my publisher sit down with my books, we vet every page.

The lawyer edit is the largest edit of my books. We sit there for hours going through every page of this to make sure it's all, you know, we have documentation for it all. I mean, do we argue about what it means to crash a computer? If a computer screen freezes, is that a crashed computer? I think so. I mean--

|Laughter]

You know, you just can't go down this line of questioning. It just goes on and on, and you don't know where to go with it.

02:37:51

**Caller:** Now, regarding the people protesting about your books being "non-fiction," if you called them fiction, people would be protesting just as much saying it's about them.

**Ben Mezrich:** Yeah, you're right. You know, it's a funny discussion, and it keeps coming up, and I don't mind talking about it.

The controversy is good. It's good for me, it's good for everybody to talk about what is fiction and non-fiction.

I just think in the end, you know, people just have to realize that if you're open and honest about how you write...this is how I write...don't read it if you don't like it! You know? You know what you're getting into.

I'm not trying to trick anybody. This is a true story, but it's written like a movie. If you have a problem with that, go read an encyclopedia. That's my opinion.

I like the way I write, and I like to read books like this, and I think a lot of people agree with that. Um, and, you know, you can pull open the book and turn to a page and find, you know, uh, somebody describes his shirt as gray and maybe it was off-gray. I'm sorry. But the reality is, this is a true story.

2:38:59

**Caller:** I think some of the controversy about the fiction / non-fiction, I think it's ultimately jealousy. Mark Zerk--Zuckerberg, people are jealous at, and I think maybe some of that jealousy is directed towards the author. What do you think?

**Ben Mezrich:** I mean, uh, you know, it's interesting. I always, uh, you know, uh, no author really loves the critics of their books. No author really likes to read critiques of their books, but I do think--it's jealousy, but it's also, you know, there are a lot of journalists who are looking for, uhm, a story.

And for a long time it was very easy to write a story about a non-fiction book that may or may not have true elements. And so it's very easy to write an article that gets printed in a newspaper if you can point out something wrong with a book. So I think that's where it all comes from, it comes from journalists looking for a story--more than necessarily professional--I mean, all writers are jealous of each other. We're all jealous of each other. We're all filled with envy. Every time you read the newspaper about some big advance, you feel envious. Every writer does; it's like part of being a writer. It's part of our birthright. It's like, oh, that guy got a million dollars for that? I hate him. But you don't really hate him. *Schadenfreude*, is that what it is? It's that whole feel.

I don't know what it is specifically. I think that I have become a lightning brand for a certain form of writing, um, and uh then people will, you know, some people will hate it, and some people will like it.

## SCHEDULE B
### Errors in *The Accidental Billionaires*

1. Hardcover Jacket
   "One lonely night, Mark hacked into the university's computer system, creating a ratable database of all the female students on campus—and subsequently crashing the university's servers..."

   Errors
   - The latter part of this sentence is patently false. The one server that crashed due to FaceMash was Mark Zuckerberg's personal computer (according to Mark), though it's likely even this claim is exaggerated. In reality, the administration suddenly terminating Mark's internet access for violating network usage policy may have just confused him into thinking that something had crashed, or provided enough material for Mark to blow up into a more grandiose claim.
   - Mr. Mezrich's retelling of this tale on C-SPAN implies that Mark's actions actually crashed every single computer system at Harvard University. This is also false.

2. Page 15
   "Mark's reputation, however, definitely preceded him: a computer science major who lived in Eliot House..."

   Errors
   - During his sophomore year, Mark was a resident of Kirkland House, not Eliot House. He studied psychology and computer science.

3. Page 18
   "...better at logarithms drunk..."

   Errors
   - "Logarithms" does not make sense in a computer science context. "Algorithms" is the intended word.

4. Page 29
   "Victor Gua"

   Errors
   - The proper spelling of Victor's last name is "Gao."

5. Page 31
   "Wanted add"

   Errors
   - "Wanted ad" was probably intended.

6. Page 47
   "It was hacking at its most fundamental—like a cryptographer working out of some cave to defeat the Nazis' code.

   Errors
   - The "perl script" described above this line on page 47 did not involve cryptography in any way.

7. Page 61

   Errors

"'Yeah, wow. It got like twenty thousand hits in twenty minutes."

- 450 people voted on photographs 22,000 times over the course of several days according to The Harvard Crimson.  See http://www.thecrimson.com/article.aspx?ref=350143.  Also see page 56.

8. Page 71
"Victor Gua"

Errors
- The proper spelling of Victor's last name is "Gao."

9. Page 80
"And some kid named Aaron Greenspan on campus had gotten in trouble a few months before for getting kids to join an info-sharing bbs that had used their Harvard e-mails and IDs as passwords."

Errors
- houseSYSTEM was not an "info-sharing bbs." BBS (bulletin board system) should be capitalized. BBSes were used on character-based terminals in the 1980s and early 1990s and were long since obsolete by 2003.
- houseSYSTEM did not use Harvard e-mail addresses or ID numbers as passwords.

"Then the Greenspan kid had gone on to develop something called houseSYSTEM that had some social elements involved in it. Grossman had even added a Universal House Facebook into his site, which Mark had checked out; hardly anyone had paid any attention to it, as far as Eduardo knew."

- Plaintiff's face book was called "The Universal Face Book," "The Face Book," and "The Facebook," but never "Universal House Facebook."
- No evidence supports the characterization of houseSYSTEM offered here.
- 1,800 out of 6,400 people is more than "hardly anyone."
- Plaintiff's name is not "Grossman."

"Friendster wasn't exclusive, the way Mark was describing his idea. And Grossman's site wasn't particularly slick, and wasn't about pictures and profiles. Mark's idea was really different. It was about moving your real social network onto the Web."

- Referring to Friendster in the middle of talking about houseSYSTEM implies some linkage or similarity when there is not one. In fact, houseSYSTEM was exclusive to Harvard students, just like Facebook was in 2004.
- Plaintiff's name is still not "Grossman."
- houseSYSTEM did have a Photo Album long before Facebook.  It also did have user profiles as of March, 2004, and it had class profiles beginning in 2002 via CriticalMass.
- "Mark's idea" was not significantly different from Plaintiff's.

10. Page 82
"Facemash has gotten him in trouble--but it had also shown the world exactly what Mark had wanted to show--that he was smarter than everyone else. He'd beaten Harvard's computers, then he'd beaten the ad board."

Errors
- Facemash demonstrated that Mark was immature and insensitive, but not "smarter than everyone else."
- Regarding Facemash, Mark did not "beat" Harvard's computers or the Administrative Board. None of Harvard's computers even slowed down except for Mark's own computer, and he was officially reprimanded.

11. Page 96
"Likewise, choosing your own password was integral; that Aaron Greenspan kid had gotten into so much trouble for having students use their Harvard ID numbers and system passwords to log onto his site. Mark had even e-mailed with him about his experience, the trouble he'd had with the ad board. Greenspan had immediately tried to get Mark to partner up with him—just like the Winklevoss twins and their Harvard Connection dating site.
Everyone wanted a piece of Mark, but Mark didn't need anyone else. Everything he needed was right in front of him."

- Users did not ever need a Harvard ID to log into houseSYSTEM. Such a misperception could be reached by paying especially close attention to the introductory chapter detailing a conversation with President Summers.
- Aaron Greenspan was never officially reprimanded by the Administrative Board.
- Aaron Greenspan began e-mailing Mark two to three months after houseSYSTEM launched, not immediately, and did not
- suggest working together until January 8, 2004.
- The analogy between Aaron Greenspan and the Winklevoss twins is inappropriate and suggests false implications.
- Unlike the Winklevosses and Divya Narendra, the subjects of this paragraph, Aaron Greenspan knew how to write computer software.
- With negligible net worth in 2004, there was no reason for Aaron Greenspan or anyone to want a "piece" of Mark Zuckerberg.

12. Page 129
"He pointed toward the bookshelf behind the president, where he could clearly see a row of Harvard Handbooks from years past."

- There was no bookshelf behind the president's desk in Massachusetts Hall. Whether President Summers was sitting at his desk or sitting in his

37

plush chair on the side of his office closest to Massachusetts Avenue, this description is incorrect. A bookshelf was located on the opposite side of the wall from a plush chair, and behind the President (when he was sitting at his desk) would have been his computer.

13. Page 123
"Zuckerberg maintained that he hadn't started work on his thefacebook.com until after their last meeting on January 15; which seemed odd, considering that he'd registered the domain name thefacebook.com on January 13."

Errors
• thefacebook.com was registered on January 11, 2004, not January 13, 2004. See http://www.networksolutions.com/whois-search/thefacebook.com

14. Page 127
"...case of a sophomore student who broke the honor code..."
Page 130
"'You entered into a code of ethics with the university...'"

Errors
• Harvard does not have an honor code. See http://www.thecrimson.com/article.aspx?ref=513249

15. Page 169
"...experts on Linux and front-level coding."

Errors
• It is unclear what front-level coding refers to. "front-end coding" makes more sense in this context.

16. Page 231
"He looked up at the glass-and-chrome building that housed Sequoia Capital's main offices."

Errors
• Sequoia Capital's main offices are in an inconspicuous wooden building in an office park approximately 40 miles from the nearest glass-and-chrome building tall enough to look "up" at.

17. Bibliography
"Greenspan, Aaron. /Authoritas/. Palo Alto, CA: Think Press, 2008."

"Luke O'Brian"

Errors
• The full title is *Authoritas: One Student's Harvard Admissions and the Founding of the Facebook Era.*
• The proper spelling of Luke's surname is "O'Brien."

Fabrications
18. Scenes involving the girlfriends of characters in the book

Errors
• Defendant Mezrich admits that these events never took place as described.

| Omissions | Implications |
|---|---|
| 19. Mark Zuckerberg visited Aaron Greenspan's Facebook repeatedly throughout the month of January, 2004. | • With this fact, it appears that Mark relied heavily on a third-party who came up with the idea before he did, and that Mark's work was therefore unoriginal.<br>• As this fact was absent, Mark was painted as a "genius" whose nominally original idea changed the world. |
| 20. The nature and timing of the Harvard administration's actions against Aaron Greenspan | • With this set of facts, readers are likely to appreciate Aaron Greenspan's later concerns about Mark Zuckerberg's proposal<br>• As these facts were absent, Aaron Greenspan can be portrayed as an overly self-confident individual who is too stupid to appreciate Mark Zuckerberg's genius |
| 21. Mark Zuckerberg and Dustin Moskovitz's January 8, 2004 dinner with Aaron Greenspan, during which Mark stated, "I think you have good ideas." | • With this fact, Mark's knowledge of houseSYSTEM and The Facebook therein is clearly not a coincidence.<br>• With this fact, it is clear that at one point Mark Zuckerberg respected Aaron Greenspan and his work.<br>• As this fact was absent alongside others, it was unclear whether or not Mark Zuckerberg even knew of Aaron Greenspan, let alone respected him. |
| 22. Mark Zuckerberg and Aaron Greenspan Both attended Computer Science / Applied Math 91r, a small computer science seminar | • With this fact, Mark has yet another connection to Aaron Greenspan that rules out coincidence<br>• As this fact was absent, Mark was portrayed as an unparalleled computer science "genius" |
| 23. The similarities between the houseSYSTEM Facebook and Mark Zuckerberg's Facebook | • With these facts, Aaron Greenspan receives deserved credit for his work<br>• Without these facts, Aaron Greenspan receives no credit for his work |
| 24. Aaron Greenspan had no malicious intent in developing houseSYSTEM or The Facebook, and his actions were horribly misconstrued by The Harvard Crimson | • With this fact, readers are likely to be sympathetic toward Aaron Greenspan<br>• As this fact was absent, Aaron Greenspan is portrayed as a potentially malicious, untrustworthy individual notable only for his ability to get in trouble for doing shoddy work that barely anyone knows about anyway |
| 25. Mark Zuckerberg broke into the e-mail | • With this fact, readers are likely to |

39

accounts of Harvard Crimson reporters

notice the irony of Aaron Greenspan being accused of crimes that in actuality Mark Zuckerberg later committed

- Without this fact, Mark Zuckerberg appears far more forgivable

## CERTIFICATE OF MAILING AND SERVICE

I certify that on November 15, 2011, a true copy of the foregoing **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND JURY DEMAND** is being served via USPS Certified Mail to the following addresses:

Ms. Katherine J. Trager
Senior Vice President, Secretary
General Counsel
Random House, Inc.
1745 Broadway
New York, NY  10019

Mr. Benjamin Mezrich
President
Mezco, Inc.
770 Boylston Street
Apartment 26J
Boston, MA  02199

Columbia Pictures Industries, Inc.
c/o National Registered Agents, Inc.
875 Avenue of the Americas
Suite 501
New York, NY 10001

By _____
        Aaron Greenspan
        884 College Avenue
        Palo Alto, CA 94306-1303
        greenspan@post.harvard.edu